2021 IL App (1st) 200390

Nos. 1-20-0390, 1-20-0391 (cons.)

Fourth Division
March 31, 2021

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| McGINLEY PARTNERS, LLC, an Illinois Limited Liability Company, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| ROYALTY PROPERTIES, LLC, a Florida Limited Liability Company; RICHARD KIRK CANNON, an Individual; and MERYL SQUIRES CANNON, an Individual, | ) ) ) ) ) | No. 2014 L 005231 The Honorable Daniel J. Kubasiak, Judge Presiding. |
| Defendants-Appellants | ) ) | |
| (Merix Pharmaceutical Corporation, Third-Party Respondent-Appellant). | ) ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Reyes and Martin concurred in the judgment and opinion.

**OPINION**

¶ 1       In February 2017, plaintiff McGinley Partners, LLC, obtained an $8.3 million judgment against defendants Royalty Properties, LLC (Royalty Properties), Richard Kirk Cannon, and Meryl Squires Cannon (collectively, the Cannons), arising from a $1.5 million loan and mortgage executed by Royalty Properties and guaranteed by the Cannons. The instant consolidated appeals arise from several orders entered by the trial court in supplementary

proceedings related to that judgment, in which plaintiffs served defendants with citations to discover assets and also served Merix Pharmaceutical Corporation (Merix), a corporation founded by Squires Cannon, with a third-party citation to discover assets. Plaintiff subsequently claimed that Merix violated the third-party citation when it made certain payments on Squires Cannon's behalf. The trial court granted plaintiff's motions for judgment against Merix and entered judgments for $297,846.53 and $1,103,876.25, respectively. The court also set aside as fraudulent certain transfers of intellectual property made by Merix to another corporation founded by Squires Cannon, Meritus Corporation (Meritus). Defendants and Merix appeal, claiming that the trial court made several errors in its consideration of plaintiff's motions. For the reasons set forth below, we affirm the court's judgment but modify the amount of the judgment to correct a mathematical error.

¶ 2                                    BACKGROUND

¶ 3        The underlying loan that gave rise to the supplementary proceedings at issue here has been the subject of extensive litigation, resulting in a number of appeals before this court, most recently in *McGinley Partners, LLC v. Royalty Properties, LLC*, 2020 IL App (1st) 190546. We relate here only the details necessary to understand the context for the instant litigation, drawing our facts from our prior decisions.

¶ 4        The Cannons owned 43 horses, which resided on a farm in Barrington Hills owned by Horizon Farms, Inc. (Horizon Farms). In 2006, Horizon Farms solicited bids in an effort to sell the farm, and the Cannons submitted a bid of $19.35 million for the property, which was accepted. The Cannons made an earnest money deposit of nearly $2 million and financed the rest of the purchase price, primarily by obtaining a loan of $14.5 million from Amcore Bank in exchange for a mortgage on the property and the personal guaranties of the Cannons. In

2

order to obtain this financing, Amcore Bank required the Cannons to form a limited liability company to sign for the loan as the mortgagee. Accordingly, the Cannons created Royalty Properties. In addition, Horizon Farms, the seller, loaned $1.5 million to Royalty Properties, evidenced by a promissory note and secured by a second mortgage on the property, as well as the personal guaranties of the Cannons. Horizon Farms subsequently assigned its interest in the note and guaranty to the William J. McGinley Marital Trust (trust) upon the dissolution and liquidation of Horizon Farms. The trust later assigned all of its right, title, and interest in the note and guaranty to plaintiff. It is this loan that gave rise to the supplementary proceedings at issue in the case at bar.

¶ 5        On May 15, 2014, plaintiff filed a complaint against defendants to enforce the note and guaranty executed by them with respect to the Horizon Farms loan when they defaulted.[1] The court granted summary judgment in favor of plaintiff and entered judgment in the amount of $8,320,669.43 on February 2, 2017, a decision we affirmed on appeal in *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 171317. Defendants subsequently filed two petitions to vacate the judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2016)), both of which were denied; we affirmed the denial of the 2-1401 petitions in *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 172976, and in *McGinley Partners*, 2020 IL App (1st) 190546.

¶ 6        On June 16, 2017, plaintiff issued citations to discover assets to each of the Cannons, and on October 2, 2017, plaintiff issued a third-party citation to discover assets to Merix. Each of the citations contained a restraining provision; the citation issued to Merix provided:

---

[1]The primary mortgage, issued by Amcore Bank, was also subject to litigation, beginning in 2009, when Amcore Bank filed a complaint to foreclose the mortgage. An order confirming the foreclosure sale and entering a deficiency judgment was entered on September 30, 2019.

"YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to Defendant or to which s/he may be entitled or which may thereafter be acquired by or become due to him or her, and from paying over or otherwise disposing of any moneys not so exempt which are due or to become due to Defendant, up to double the amount of the balance due, until further order of court or termination of the proceeding, whichever occurs first."

¶ 7       On August 31, 2018, plaintiff filed a motion for entry of judgment against Merix. Plaintiff claimed it had issued the citation to Merix to determine whether Merix had paid any money to Squires Cannon, Merix's president and chief executive officer. In response to the citation, Dori Squires Hough, Squires Cannon's daughter and executive vice president of Merix, denied that Merix had paid any money to Squires Cannon. However, on July 30, 2018, during her citation examination, Squires Hough testified that, at the instruction of Squires Cannon, Merix paid a number of Squires Cannon's credit card bills on a monthly basis and had done so for the past few years. These payments were entered into Merix's accounting system as loans, but Squires Hough could not recall any payments made by Squires Cannon toward any of the loans. She further testified that Squires Cannon charged personal expenses on company credit cards, which Merix also paid, and that Merix made monthly payments on the vehicle driven by Squires Cannon.

¶ 8       Squires Hough also testified that Squires Cannon had previously received a salary from Merix, but that Squires Cannon decided to no longer receive a salary at some point; Squires Cannon also had previously received substantial royalties from Merix related to a patent she owned. Squires Hough additionally testified that Merix paid the bills of Royalty Farms, LLC

4

(Royalty Farms), an entity owned in part by Squires Cannon, at a rate of approximately $5000 per week, which were classified as loans; however, Squires Hough had never been provided with any loan documents and could not recall the amounts of any payments made by Royalty Farms.

¶ 9 Plaintiff claimed that the citation against Merix prohibited Merix from making any payments to Squires Cannon and that Merix had violated the citation. Accordingly, plaintiff requested the entry of judgment against Merix. Attached to the motion were the transcript from Squires Hough's citation examination, as well as Squires Hough's answer to the citation, in which she denied that Merix paid any money to Squires Cannon.

¶ 10 On January 23, 2019, plaintiff filed several motions related to the citation proceedings. First, plaintiff filed a motion to set aside certain allegedly fraudulent transfers. Plaintiff claimed that Merix maintained an exclusive license to manufacture and distribute Releev, a cold sore treatment invented by Squires Cannon, pursuant to a 1999 licensing agreement between Merix and Squires Cannon. Under this licensing agreement, Squires Cannon had received substantial royalties, with the royalties at one time being valued at $6 million. However, notwithstanding the fact that Squires Cannon was in substantial debt at the time, on July 1, 2011, she sold her 85% ownership interest in Merix, as well as her numerous patents and trademarks, to Meritus, a corporation in Dominica, for $10. Plaintiff claimed that the patent and trademark assignments were characterized as *nunc pro tunc*, were not notarized, and were not registered with the trademark office until July 10, 2015, despite purportedly being executed on July 1, 2011. Plaintiff further claimed that the patent and trademark assignments made clear that Squires Cannon was to continue to receive royalties from the patents and trademarks through July 2015. Similarly, the assignment of Merix shares were not notarized and provided that Meritus'

5

ownership in the shares would not vest until royalties under the licensing agreement had been paid to Squires Cannon through July 2015.

¶ 11    Plaintiff claimed that Squires Cannon took the position that the assignments were made as part of a global expansion effort in order to expand Releev's distribution networks. Squires Cannon claimed that European companies did not desire to do business with American companies, so she was advised to create an offshore company instead, which led to the creation of Meritus. Plaintiff noted that Squires Cannon was the only person who contributed assets to Meritus but that she claimed not to have any ownership interest in Meritus or even know who owned Meritus. Plaintiff contended that Squires Cannon was the owner of Meritus, which was evidenced by the terms of the purported assignments and by the fact that she was actively seeking to sell the Releev brand. Plaintiff further contended that the Merix shares and patent and trademark transfers made up substantially all of Squires Cannon's assets at the time that the transfers were made. Plaintiff claimed that the transfers to Meritus were fraudulent under the Uniform Fraudulent Transfer Act (Act) (740 ILCS 160/1 *et seq.* (West 2018)) and should be set aside. Attached to plaintiff's motion were the transcript from Squires Cannon's citation examination and the assignments at issue.

¶ 12    The intellectual property assignments were all substantively identical and provided that Squires Cannon:

> "do[es] sell, assign and transfer unto said Assignee the entire right, title and interest in and to the said Patents aforesaid, along with the rights and subject to the obligations of the existing license thereof to Merix Pharmaceutical Corp. dated June 25, 1999 with all payments actually received from Merix for the next four years to be paid directly to

Patentee, *** provided, Patentee shall retain the right to negotiate and grant a license of the Patents to third parties so long as Patentee assigns any such license to Assignee."

¶ 13     The assignment of Merix shares provided, in relevant part:

"Notwithstanding anything to the contrary herein, this Assignment is contingent upon Assignee maintaining in full force and effect that existing license ('License') of Assignor's patents and marks to Merix dated June 25, 1999, regardless of Merix'[s] ability to remain fully current on its royalty obligations thereunder, but with any unpaid royalties to be carried as a debt of Merix to be repaid to Assignee when it is able but only after all of Merix'[s] normal operating vendors, agents and employees have been fully and currently paid; and this Assignment is further contingent upon Assignor receiving directly any and all royalty payments made by Merix under said License over the next four years, after which time ownership of said Shares shall be automatically vested in Assignee and recorded on the corporate books of Merix."

¶ 14     Also on January 23, 2019, plaintiff filed a motion to bar defendants from using Meritus' records. Plaintiff claimed that, based on Squires Cannon's testimony at her October 25, 2018, citation examination, plaintiff had repeatedly requested that she supply additional documents and records pertaining to the formation of Meritus, the global expansion effort of Releev, and Squires Cannon's relationship to Meritus. However, she failed to supply any of the requested information. Plaintiff noted that at a December 29, 2018, hearing, the trial court stated that defendants would be barred from using any documents that they failed to produce. Consequently, plaintiff sought an order barring defendants from using any documents that might suggest (1) that the transfers were made as part of Releev's global expansion effort and

(2) that anyone other than Squires Cannon was the sole and exclusive owner of Meritus at the time of the transfers.

¶ 15 Finally, also on January 23, 2019, plaintiff filed a motion to bar any evidence that the payments of Squires Cannon's personal expenses by Merix were loans. Plaintiff claimed that defendants had failed to supply any documents supporting such a position, despite repeated requests for such evidence. Consequently, plaintiff sought an order barring defendants from using any documents suggesting that the money paid on behalf of Squires Cannon was a loan.

¶ 16 In response to plaintiff's motions to bar, defendants argued that they should be permitted to present their evidence fully, especially where the original citations did not request information about Meritus. Additionally, with respect to plaintiff's motion to set aside the transfers to Meritus as fraudulent, defendants argued that plaintiff's claim was barred by the four-year statute of limitations, as the transfers occurred in 2011, and that the transfers were not fraudulent.

¶ 17 On March 15, 2019, the trial court entered an order in which it gave Merix until April 15, 2019, to produce any additional records "or be barred from using same in any future proceeding." On March 20, 2019, the trial court entered an order granting plaintiff's motion to bar Meritus' records. On April 2, 2019, defendants filed a motion to reconsider.

¶ 18 On April 25, 2019, the trial court entered an order finding that plaintiff's motion to set aside the transfers to Meritus as fraudulent was not time-barred. The court found that the 2015 dates on which the transfers were recorded, not the 2011 dates on which the assignments were purportedly signed, triggered the running of the statute of limitations. Additionally, the court found that the assignment of the Merix shares was effective as of 2015 because the assignment

8

provided on its face that Squires Cannon would be entitled to four years of royalties before the shares would vest, meaning that the earliest the shares were transferred was July 1, 2015.

¶ 19 Also on April 25, 2019, the trial court entered an order granting plaintiff's motion to bar Merix's records and denying defendants' motion to reconsider the order barring Meritus' records.

¶ 20 On May 21, 2019, plaintiff filed a renewed motion for entry of judgment, which incorporated the claims of the original motion, and further claimed that the documents produced by Merix in response to the citation were sufficient to show a citation violation and requested that judgment be entered without an evidentiary hearing. Plaintiff also requested "that this Court enter a judgment against Merix *** in an amount to be determined upon prove up" of damages.

¶ 21 In response to the renewed motion, Merix claimed that the documents it had produced did not establish that it had violated the citation and argued that the amounts paid to Squires Cannon were compensation owed to her for her performance as an officer of Merix. Merix thus argued that 85% of that amount was exempt from the citation proceedings. Merix contended that it had paid Squires Cannon $70,817.84[2] in compensation and agreed to pay 15% of that amount to plaintiff, which was $10,622.68. In its reply, plaintiff claimed that Merix's arguments about compensation contradicted its previous statements that Squires Cannon received no compensation and further claimed that Merix overlooked a number of other payments made on behalf of Squires Cannon in violation of the citation. In its reply, plaintiff also included calculations based on Merix's response to the citation for each of the purportedly

---

[2]Plaintiff's calculation was that this amount was $71,332.60.

unauthorized payments. Adding all of these other payments, plaintiff requested that the court enter a judgment against Merix in the amount of $1,157,901.44 for violation of the citation.

¶ 22      On June 17, 2019, defendants filed a motion to continue the hearing on the allegedly fraudulent transfers, claiming that plaintiff was required to join Merix and Meritus as necessary parties. The trial court denied the motion on June 18, 2019, and conducted an evidentiary hearing on the same day, at which both Cannons testified.

¶ 23      On July 24, 2019, defendants filed a motion seeking to supplement the record with documents that they claimed showed that Squires Cannon no longer had any interest in Meritus. The trial court denied the motion on August 8, 2019, finding that admission of the records would conflict with its prior order barring Meritus' records and further finding that the documents had not been properly authenticated and therefore constituted inadmissible hearsay. Defendants filed a motion to reconsider, which was denied.

¶ 24      On August 28, 2019, the trial court entered judgment against Merix in the amount of $289,958.04. The court further granted plaintiff leave to file a renewed motion for judgment against Merix with respect to amounts not included in the initial judgment. While the report of proceedings for the August 28, 2019, hearing on the motion is not contained in the record on appeal, the parties have included excerpts from that hearing. At the hearing, the court stated that it found that plaintiff was entitled to judgment relating to (1) $71,332.60 in payments that Merix contended was compensation for Squires Cannon, (2) $106,084 in initial attorney fees, (3) an additional $77,000 in attorney fees, and (4) $35,541.44 in payments for the vehicle driven by Squires Cannon. However, the court found that plaintiff had not established that it was entitled to (1) $837,693.40 in payments for the expenses of Royalty Farms and Royalty

Properties, (2) a $21,500 " 'gift' " to Royalty Properties, or (3) credit card payments in the amount of $8750. Merix filed a motion to reconsider the judgment, which was denied.

¶ 25    On September 3, 2019, defendants filed a motion to stay or dismiss plaintiff's motion to set aside the allegedly fraudulent transfers to Meritus, claiming that the court lacked jurisdiction to set aside the transfers because plaintiff failed to join Meritus as a necessary party.

¶ 26    On September 25, 2019, plaintiff filed a renewed motion for entry of judgment against Merix, seeking an additional $859,193.40 that it claimed Merix paid to Royalty Farms and Royalty Properties. Plaintiff first claimed that defendants had been barred from using or referring to records "tending to support that money paid to or on behalf of Judgment Debtors and/or entities owned or managed by them since October 3, 2017 constitute true loans and not funds which [Squires Cannon] has a right or entitlement." Plaintiff also claimed that, even if the court considered them as loans, Squires Cannon had control over the funds "loaned" to Royalty Farms and Royalty Properties because she was a managing member of both entities and was an authorized signatory for both entities' bank accounts. Accordingly, plaintiff claimed that they were funds to which Squires Cannon was entitled, in violation of the citation provision. Plaintiff later supplemented its motion based on additional documents produced by Merix, claiming that the actual amount paid to Royalty Farms and Royalty Properties was $1,095,972.76, and also including another $7903.49 paid to Squires Cannon's attorney.

¶ 27    In response, Merix claimed that judgment was inappropriate because Squires Cannon did not wholly own the two entities and there was no evidence that she received the proceeds in her individual capacity. Merix argued that if the entities were not wholly owned by Squires Cannon, plaintiff could not establish that Merix's payments to Royalty Farms and Royalty

11

Properties violated the citation. Merix further argued that the attorney fees sought by plaintiff included several costs for court reporting services, which Merix was entitled to obtain and pay for as a third-party citation respondent. In its reply, plaintiff contended that Merix had never produced any documents showing that the payments were loans and was now barred. Plaintiff further contended that the record was clear that Squires Cannon requested the proceeds; she was the sole individual with authority to request disbursements on behalf of Royalty Farms and had authority to request loans on behalf of Royalty Properties. She was also the sole person authorized to make disbursements from Merix. Accordingly, plaintiff claimed that the payments violated the citation. Plaintiff also argued that the $3178.49 for court reporting services should be included in the judgment, claiming that Merix included that amount when producing records as to any payments made on Squires Cannon's behalf and also later supplied a certificate of completion and accuracy certifying the accuracy of that production. Plaintiff argued that Merix could not now claim that the court reporting services were for its benefit, not Squires Cannon's.

¶ 28    On November 1, 2019, the trial court entered an order setting aside the transfers to Meritus as fraudulent. The court found that the transfers were to an insider; that Squires Cannon retained possession and control of the patents, trademarks, and shares after the transfers; that Squires Cannon had not only been sued but had been unsuccessful in her efforts to have the lawsuit dismissed prior to making the transfers; and that the transfers were of substantially all of Squires Cannon's assets. The court found unpersuasive Squires Cannon's contention that the transfers were part of Releev's global expansion effort, finding that there was no evidence to support that contention, apart from Squires Cannon's "self-serving and unconvincing testimony," and that any such deal failed long before Meritus incorporated in 2014. The court

further found that the patents, trademarks, and shares were worth "substantially more" than the $10 purportedly paid for them. Finally, the court found that the joinder of Meritus was not necessary, as Squires Cannon was in privity with Meritus as its sole owners and adequately represented its interests.

¶ 29    On November 14, 2019, defendants filed a motion to reconsider the order setting aside the transfers to Meritus, claiming that both Merix and Meritus were required to be joined as necessary parties and that Squires Cannon did not adequately represent Meritus' interests.

¶ 30    On January 24, 2020, the trial court entered judgment against Merix in the amount of $1,103,876.25. It also amended the prior judgment to include $7903.49 in additional payments, bringing that judgment to $297,846.53. In total, the amount of the judgments against Merix was $1,401,722.78.[3] The trial court also entered an order denying defendants' motion to reconsider the order setting aside the transfers to Meritus.

¶ 31    On February 24, 2020, defendants and Merix separately filed notices of appeal. The two appeals were consolidated on May 29, 2020.

¶ 32                                                    ANALYSIS

¶ 33    On appeal, defendants raise issues concerning the various orders entered by the trial court. Specifically, defendants contend (1) that the trial court erred in entering the judgments against Merix, (2) that the trial court erred in granting plaintiff's motion to set aside the transfers to Meritus, and (3) that the trial court erred in failing to require joinder of Merix and Meritus as necessary parties.[4]

---

[3]As we later discuss, this amount includes a mathematical error by the trial court.
[4]As an initial matter, we must note that, under Illinois Supreme Court Rule 6 (eff. July 1, 2011), any Illinois cases filed on or after July 1, 2011, must be cited by using the public-domain citation. Plaintiff has failed to comply with this rule, citing only the Lexis citation for each case. This has made it extremely difficult for this court to access the cases that plaintiff relies on in support of its

13

¶ 34                                    I. Judgments Against Merix

¶ 35          With respect to the August 2019 and January 2020 judgments against Merix, defendants

claim (1) that the trial court erred in entering the judgments without first holding an evidentiary

hearing and (2) that the trial court erred in entering the January 2020 judgment because the

court incorrectly found that certain payments were made on behalf of the Cannons. Where a

trial court did not conduct an evidentiary hearing or make factual findings, we review its ruling

in supplementary proceedings *de novo*. *Kauffman v. Wrenn*, 2015 IL App (2d) 150285, ¶ 15;

see also *Xcel Supply, LLC v. Horowitz*, 2018 IL App (1st) 162986, ¶ 57 ("Where a trial court

relies solely on the parties' oral argument and the record, without conducting an evidentiary

hearing or making any findings of fact, a reviewing court will employ a *de novo* standard of

review."). *De novo* consideration means we perform the same analysis that a trial court would

perform. *Xcel Supply*, 2018 IL App (1st) 162986, ¶ 57.

¶ 36          We first consider defendants' contention that an evidentiary hearing was required before

the trial court could enter either the August 2019 or the January 2020 judgment against Merix.

Section 2-1402 of the Code governs supplementary proceedings in Illinois. 735 ILCS 5/2-1402

(West 2018). This section permits a judgment creditor, like plaintiff in the case at bar, to serve

a citation to the judgment debtor or on a third party, seeking "to discover assets or income of

the debtor not exempt from the enforcement of the judgment, a deduction order or

garnishment," and to apply such nonexempt assets or income toward the payment of the

amount due under the judgment. 735 ILCS 5/2-1402(a) (West 2018).

¶ 37          Section 2-1402(f)(1) authorizes the citation to include a restraining provision:

---

arguments, a result plaintiff surely does not desire. While this court has reviewed all relevant caselaw
cited by the parties, we counsel plaintiff to cite the court's official reporter in the future.

"The citation may prohibit the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment therefrom, a deduction order or garnishment, belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her, and from paying over or otherwise disposing of any moneys not so exempt which are due or to become due to the judgment debtor, until the further order of the court or the termination of the proceeding, whichever occurs first." 735 ILCS 5/2-1402(f)(1) (West 2018).

All of the citations issued in the case at bar, including the citation issued to Merix, included such a restraining provision.

¶ 38        Section 2-1402(f)(1) further provides that "[t]he court may punish any party who violates the restraining provision of a citation as and for a contempt, or if the party is a third party may enter judgment against him or her in the amount of the unpaid portion of the judgment and costs allowable under this Section, or in the amount of the value of the property transferred, whichever is lesser." 735 ILCS 5/2-1402(f)(1) (West 2018). The trial court's judgments against Merix were entered pursuant to this provision.

¶ 39        Defendants contend that an evidentiary hearing was required before the trial court was permitted to enter judgment against Merix. We note that defendants rely on a number of cases involving turnover orders. See, *e.g.*, *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277 (2007); *Workforce Solutions v. Urban Services of America, Inc.*, 2012 IL App (1st) 111410; *Harmon v. Ladar Corp.*, 200 Ill. App. 3d 79 (1990). However, as noted, the judgments in the case at bar were not turnover orders under section 2-1402(c). See 735 ILCS 5/2-1402(c) (West 2018) (permitting a court to order turnover of the judgment debtor's

15

income or assets). Instead, they were judgments for violation of the restraining provision under section 2-1402(f)(1). We have previously found that it is not clear whether an evidentiary hearing is required under such circumstances. See *Xcel Supply*, 2018 IL App (1st) 162986, ¶ 50 (noting that "it is unclear if an evidentiary hearing or trial is *** required for a citation violation, where the parties have submitted briefs, affidavits, deposition transcripts, and other documentary exhibits"). We find that, under the facts of this case, no evidentiary hearing was required because all of the facts and evidence in this case were before the trial court.

¶ 40    A violation of the restraining provision presupposes that the property possessed by the third-party citation respondent belongs to the judgment debtor. *Door Properties, LLC v. Nahlawi*, 2020 IL App (1st) 173163, ¶ 30.[5] Thus, the relevant question becomes whether the third party is holding assets of the judgment debtor that should be applied to satisfy the judgment. *Door Properties*, 2020 IL App (1st) 173163, ¶ 31. It is the judgment creditor's burden to demonstrate that the third-party respondent possesses assets of the judgment debtor. *Door Properties*, 2020 IL App (1st) 173163, ¶ 31.

¶ 41    In *Door Properties*, the appellate court determined that resolution of this question required an evidentiary hearing. *Door Properties*, 2020 IL App (1st) 173163, ¶ 55. The court noted that the trial court did not conduct an evidentiary hearing, so the only evidence before the trial court was documentary evidence consisting of transcripts, which did not fully answer the question of whether the funds at issue were the result of a debt or were a gratuitous gesture. *Door*

---

[5]We note that defendants cite this case for the first time in their reply briefs. While we recognize that the opinion was issued only a week before defendants filed their opening brief, we caution that a party may not raise an argument for the first time in the reply brief, as this deprives opposing counsel of the opportunity to address the issue. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued [in the opening brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

*Properties*, 2020 IL App (1st) 173163, ¶ 38. Given the questions of fact presented by the record, the court found that "the better course is to vacate the judgment and remand for an evidentiary hearing." *Door Properties*, 2020 IL App (1st) 173163, ¶ 55.

¶ 42    By contrast, in *Kauffman*, the appellate court was able to resolve the question of whether the third party violated the citation without an evidentiary hearing. There, the parties stipulated to several facts concerning the bank account at issue. *Kauffman*, 2015 IL App (2d) 150285, ¶ 10. The court found that the evidence before it was sufficient to support the trial court's determination that the third party had violated the citation by failing to freeze the account. *Kauffman*, 2015 IL App (2d) 150285, ¶ 30. However, finding that the judgment creditor had failed to prove that all of the funds transferred from the account belonged to the judgment debtor, the *Kauffman* court found that the trial court erred in entering judgment against the third party. *Kauffman*, 2015 IL App (2d) 150285, ¶ 32.

¶ 43    Thus, we find that the particular circumstances of the case before the court determines whether an evidentiary hearing is required. If the factual record before the court is sufficient for the court to determine whether the citation has been violated, then no evidentiary hearing may be necessary, as in *Kauffman*. However, where there are questions of fact as to the ownership of the assets, as in *Door Properties*, "the better course is to vacate the judgment and remand for an evidentiary hearing." *Door Properties*, 2020 IL App (1st) 173163, ¶ 55.

¶ 44    In the case at bar, the first judgment against Merix was entered on August 28, 2019. That judgment was the result of plaintiff's August 31, 2018, motion for entry of judgment and its subsequently filed renewed motion for entry of judgment. In the motion, plaintiff claimed that the citation examination of Squires Hough, Merix's executive vice president, revealed that Merix paid the following expenses on Squires Cannon's behalf: (1) a number of Squires

Cannon's credit cards; (2) payments for Squires Cannon's personal expenses charged on Merix's credit cards; (3) monthly payments of $1200 for the vehicle driven by Squires Cannon; (4) payroll and other bills of Royalty Farms, an entity owned at least in part by Squires Cannon, in the amount of $5000 per week; and (5) payments to Squires Cannon's attorneys. The motion further claimed that Squires Hough testified that Squires Cannon previously received both a salary and royalty payments from Merix. The renewed motion incorporated the claims of the original motion and further claimed that the documents produced by Merix in response to the citation were sufficient to show a citation violation and requested that judgment be entered without an evidentiary hearing. Plaintiff also requested "that this Court enter a judgment against Merix *** in an amount to be determined upon prove up."

¶ 45      In response to the renewed motion, Merix claimed that the documents it had produced did not establish that it had violated the citation and argued that the amounts paid to Squires Cannon were compensation owed to her for her performance as an officer of Merix. Merix thus argued that 85% of that amount was exempt from the citation proceedings. Merix contended that it had paid Squires Cannon $70,817.84[6] in compensation and agreed to pay 15% of that amount, which was $10,622.68, under the citation proceedings to plaintiff. Merix did not address the other categories of payments that plaintiff claimed violated the citation, and Merix did not request an evidentiary hearing or otherwise object to plaintiff's request that the motion be decided based on documentary evidence. In its reply, plaintiff claimed that Merix's arguments about compensation contradicted its previous statements that Squires Cannon received no compensation and further claimed that Merix overlooked a number of other payments made on behalf of Squires Cannon in violation of the citation. In its reply, plaintiff

---

[6]As noted, plaintiff's calculation was that this amount was $71,332.60.

18

also included calculations based on Merix's response to the citation for each of the purportedly unauthorized payments. Adding all of these other payments, plaintiff requested that the court enter a judgment against Merix in the amount of $1,157,901.44 for violation of the citation.

¶ 46     At the hearing on the motion,[7] the court stated that it found that plaintiff was entitled to judgment relating to (1) $71,332.60 in payments that Merix contended was compensation for Squires Cannon, (2) $106,084 in initial attorney fees, (3) an additional $77,000 in attorney fees, and (4) $35,541.44 in payments for the vehicle driven by Squires Cannon. However, the court found that plaintiff had not established that it was entitled to (1) $837,693.40 in payments for the expenses of Royalty Farms and Royalty Properties, (2) a $21,500 " 'gift' " to Royalty Properties, or (3) credit card payments in the amount of $8750.

¶ 47     Based on the evidence in the record, we cannot find that the trial court was required to hold an evidentiary hearing before entering the August 2019 judgment. The only argument that Merix made in response to plaintiff's renewed motion for judgment was its contention that approximately $70,000 of the payments constituted compensation for Squires Cannon, meaning that it was largely exempt from the citation proceedings. However, the trial court found that Merix was bound by Squires Hough's earlier testimony that Squires Cannon did not receive any compensation from Merix. Merix did not challenge the other payments that plaintiff contended were improper. While Merix claims that it lacked the opportunity to do so because plaintiff listed them for the first time in its reply brief, that claim overlooks the fact that plaintiff identified each of the categories of payments in its motion—only the calculations of the amounts were added to the reply brief. Moreover, the record does not show that Merix

_____

[7]As noted, the report of proceedings from the hearing is not contained in the record on appeal, but the parties have included excerpts attached to various motions.

objected to the filing of this reply or sought to file a surreply, nor does it show that Merix requested an evidentiary hearing. Consequently, we cannot find that the trial court erred in entering the August 2019 judgment without an evidentiary hearing.

¶ 48    With respect to the second judgment, entered on January 24, 2020, plaintiff sought judgment against Merix in the amount of $859,193.40 for payments that Merix made to Royalty Farms and Royalty Properties. Plaintiff first claimed that defendants had been barred from using or referring to records "tending to support that money paid to or on behalf of Judgment Debtors and/or entities owned or managed by them since October 3, 2017 constitute true loans and not funds which [Squires Cannon] has a right or entitlement." Plaintiff also claimed that, even if the court considered them as loans, Squires Cannon had control over the funds "loaned" to Royalty Farms and Royalty Properties because she was a managing member of both entities and was an authorized signatory for both entities' bank accounts. Accordingly, plaintiff claimed that they were funds to which Squires Cannon was entitled, in violation of the citation provision. Plaintiff later supplemented its motion based on additional documents produced by Merix, claiming that the actual amount paid to Royalty Farms and Royalty Properties was $1,095,972.76, and also including another $7903.49 paid to Squires Cannon's attorney.

¶ 49    In response, Merix claimed that judgment was inappropriate because Squires Cannon did not wholly own the two entities and there was no evidence that she received the proceeds in her individual capacity. Merix argued that if the entities were not wholly owned by Squires Cannon, plaintiff could not establish that Merix's payments to Royalty Farms and Royalty Properties violated the citation. Merix further argued that the attorney fees sought by plaintiff included several costs for court reporting services, which Merix was entitled to obtain and pay

for as a third-party citation respondent. In its reply, plaintiff contended that Merix never produced any documents showing that the payments were loans and was now barred from making that claim. Plaintiff further contended that the record was clear that Squires Cannon requested the proceeds; she was the sole individual with authority to request disbursements on behalf of Royalty Farms and had authority to request loans on behalf of Royalty Properties. She was also the sole person authorized to make disbursements from Merix. Accordingly, plaintiff claimed that the payments violated the citation. Plaintiff also argued that the $3178.49 for court reporting services should be included in the judgment, claiming that Merix included that amount when producing records as to any payments made on Squires Cannon's behalf and also later supplied a certificate of completion and accuracy certifying the accuracy of that production. Plaintiff argued that Merix could not now claim that the court reporting services were for its benefit, not Squires Cannon's.

¶ 50        In its January 24, 2020, order, the trial court found that "[u]pon review of the case law provided by [plaintiff], the court finds that as a managing member and authorized account signatory, there can be no dispute that [Squires] Cannon had control over the funds purportedly 'loaned' to Royalty Farms and Royalty Properties." The court further found that Squires Cannon also had entitlement to the funds under *National Life Real Estate Holdings, LLC v. Scarlato*, 2017 IL App (1st) 161943. Consequently, the court found that, "[b]ecause [Squires] Cannon had entitlement to the funds, payments made by Merix to Royalty Farms and Royalty Properties after Merix was served with the citation were in violation of the citation's restraining provision." The court also found that, per Merix's own records, the $7903.49 in attorney fee payments were made for the benefit of Squires Cannon and therefore should be included in the judgment.

21

¶ 51      As with the August 2019 order, we cannot find that the trial court was required to hold an evidentiary hearing prior to entering its January 2020 judgment. While Merix claims there were "numerous factual disputes" as to whether the payments violated the citations, there were no actual disputes over the relevant facts. Merix did not raise any issues as to the accuracy of plaintiff's representations about Squires Cannon's authority with respect to any of the entities but instead claimed that plaintiff needed to show that Squires Cannon wholly owned the entities in order for plaintiff to prove that Squires Cannon had sufficient control over the funds. Thus, the only dispute was the application of the law to the facts, namely, whether the level of control Squires Cannon had over the various entities meant that she controlled them. See *Scarlato*, 2017 IL App (1st) 161943, ¶ 20 (the determination of whether the proceeds of a loan fall within the purview of the restraining provision of section 2-1402(f)(1) is a question of law). Consequently, we cannot find that the trial court erred in deciding the issue without an evidentiary hearing.

¶ 52      Merix also argues that the court's conclusions were incorrect: that Squires Cannon did not control the "loan proceeds" and that the court reporting fees should not have been included in the judgment. As to the issue of control, the trial court primarily relied on *Scarlato* in finding that Squires Cannon controlled the payments made to Royalty Farms and Royalty Properties. In that case, the judgment creditor claimed that a third-party citation respondent violated the citation's restraining provision by extending a loan to the judgment debtor. *Scarlato*, 2017 IL App (1st) 161943, ¶ 1. After the issuance of the citation, the third-party citation respondent, a bank, had entered into an agreement to loan money to the judgment debtor, as well as to two companies in which he was a managing member; the judgment debtor executed the agreement and note both in his individual capacity, as well as in his capacity as managing member of each

entity. *Scarlato*, 2017 IL App (1st) 161943, ¶ 6. The bank then made disbursements in the full amount of the loan to various entities, including to one of the companies for which the judgment debtor was managing member. *Scarlato*, 2017 IL App (1st) 161943, ¶ 9.

¶ 53        On appeal, the court found that the question to be resolved was whether the loan proceeds were the judgment debtor's "property" such that the bank was prohibited from transferring, disbursing, or otherwise disposing of it. *Scarlato*, 2017 IL App (1st) 161943, ¶ 23. The court found that they were. *Scarlato*, 2017 IL App (1st) 161943, ¶ 36. The court noted that the judgment debtor signed the agreement in his individual capacity, not simply in his capacity as managing member of the other entities. *Scarlato*, 2017 IL App (1st) 161943, ¶ 36. The court further found that "one who has control over loan proceeds also has entitlement thereto." *Scarlato*, 2017 IL App (1st) 161943, ¶ 36. The court noted that, at various times, the loan proceeds passed through the bank accounts of one of the entities for which the judgment debtor was managing member and found that, as managing member, the judgment debtor had rights to those accounts even if he was not a signatory thereto. *Scarlato*, 2017 IL App (1st) 161943, ¶ 36. The judgment debtor was also the sole individual with authority to request advances on the loan, which the court found was further evidence of his control over the loan proceeds. *Scarlato*, 2017 IL App (1st) 161943, ¶ 36.

¶ 54        In the case at bar, we cannot find that the trial court erred in finding payments to Royalty Farms and Royalty Properties to be Squires Cannon's property. First, as noted by plaintiff, there is no evidence that these payments were actually loans and Merix was barred from presenting such evidence when it failed to produce any records after a certain date. Furthermore, even if they were loans, we agree with the trial court that *Scarlato* is instructive in how to treat such loans. While there is no evidence that Squires Cannon signed anything in

23

her individual capacity,[8] by Squires Cannon's own admission, she is the sole officer and manager of Royalty Farms and its sole bank account signatory and is a joint owner, manager, and bank account signatory for Royalty Properties. She also is the only authorized signatory on Merix's bank accounts and makes all final decisions for the company. Thus, Squires Cannon would have control over any payments made by Merix to either entity, and would have rights to any of those funds. Consequently, we cannot find that the trial court erred in finding these funds to be Squires Cannon's property.

¶ 55    With respect to the fees that Merix claims are court reporting fees paid on behalf of Merix, Merix contends that the evidence shows only that the fees were paid for the instant litigation, not that they were paid on behalf of Squires Cannon. Thus, Merix claims that they should not have been included because Merix was entitled to pay for its own court costs. However, Merix's argument overlooks the fact these fees were included by Merix in its supplemental production as fees paid on behalf of Squires Cannon. In other words, when asked to list all fees paid *on behalf of Squires Cannon*, Merix listed the court reporter fees. Merix cannot now argue that those fees were paid on its own behalf instead.

¶ 56    As a final matter, Merix claims that the $7903.49 in attorney fees was double-counted in the trial court's judgments. In its second motion for entry of judgment, plaintiff sought a total judgment of $1,103,876.25: $1,095,972.76 in payments made to Royalty Farms and Royalty Properties, and $7903.49 in payments for attorney fees. Since the trial court's August 2019 judgment had included payments for attorney fees, plaintiff requested that the trial court supplement that judgment to include the additional $7903.49 in attorney fees. In its January

---

[8]As noted, there are no loan agreements or other documentation as to any purported "loans" at all, other than the payments themselves.

2020 judgment, the trial court supplemented the August 2019 judgment with the additional attorney fees, to now total $297,846.53.[9] However, the trial court also entered judgment in the amount of $1,103,876.25 based on payments to Royalty Farms and Royalty Properties, instead of the $1,095,972.76 sought by plaintiff. On appeal, plaintiff does not dispute that this was an error but claims that Merix forfeited it by not raising it below. While we agree that Merix should have raised it before the trial court, affording it the opportunity to correct its error, we agree with Merix that these fees were double-counted and should not have been included twice. We have the authority to correct the judgment under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), and therefore modify the judgment to reflect a total judgment amount of $1,393.834.29—$297,861.53 for the August 2019 judgment and $1,095,972.76 for the February 2020 judgment. See *In re Marriage of Olson*, 223 Ill. App. 3d 636, 649 (1992) (modifying trial court's judgment to correct mathematical errors); *Abbott v. Fluid Power Pump Co.*, 112 Ill. App. 2d 303, 314 (1969) (same).

¶ 57                                  II. Motion to Set Aside Fraudulent Transfers

¶ 58       Defendants next argue that the trial court erred in setting aside Squires Cannon's transfers of Merix shares, patents, and trademarks to Meritus as fraudulent. Defendants argue both that plaintiff's motion to set aside the transfers was untimely and that the transfers were not fraudulent.

¶ 59                                        A. Statute of Limitations

¶ 60       We first address defendants' claim that plaintiff's motion was barred by the statute of limitations. The applicability of a statute of limitations to a cause of action presents a legal

---

[9]This calculation by the trial court is slightly incorrect: adding $7903.49 to the original $289,958.04 judgment totals $297,861.53.

question that we review *de novo*. *Travelers Casualty & Surety Co. v. Bowman*, 229 Ill. 2d 461, 466 (2008). As noted, *de novo* consideration means we perform the same analysis that a trial court would perform. *Xcel Supply*, 2018 IL App (1st) 162986, ¶ 57.

¶ 61     In the case at bar, plaintiff sought to set aside the transfers as fraudulent pursuant to the Act (740 ILCS 160/1 *et seq.* (West 2018)). Under the Act, a transfer made by a debtor is fraudulent as to a creditor, if (1) the debtor made the transfer with actual intent to hinder or defeat a creditor (fraud in fact) or (2) the transfer was made for inadequate consideration and the debtor retained insufficient assets to pay its obligation to the debtor (fraud in law). 740 ILCS 160/5(a) (West 2018); *Regan v. Ivanelli*, 246 Ill. App. 3d 798, 803-04 (1993). A cause of action with respect to a fraudulent transfer under the Act must be brought "within 4 years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant," if the alleged fraud is fraud in fact (740 ILCS 160/10(a) (West 2018)), or must be brought "within 4 years after the transfer was made or the obligation was incurred," if the alleged fraud is fraud in law (740 ILCS 160/10(b) (West 2018)).

¶ 62     With respect to the transfer of the Merix shares, the court found that the transfer of the shares occurred no earlier than July 1, 2015. The court noted that the assignment was clear on its face that the assignment was contingent on Squires Cannon receiving royalties for the next four years (until July 1, 2015) and that the shares would only vest once the royalties had been paid. We find no error with the trial court's conclusion.

¶ 63     Defendants claim that the definition of "transfer" in the Act demonstrates that even a conditional disposition of an asset may be considered a "transfer." Defendants are correct that a transfer is broadly defined under the Act to mean "every mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 740 ILCS 160/2(*l*) (West 2018). However, the Act further provides that "the transfer is made when it becomes effective between the debtor and the transferee." 740 ILCS 160/7(c) (West 2018).

¶ 64     The issue is not whether the assignment was a "transfer," but whether the cause of action was brought within four years from the date the transfer was "made." 740 ILCS 160/10(a), (b) (West 2018)). In the case at bar, the language of the assignment expressly provides that the shares will only vest once the royalties have been paid. Accordingly, the transfer could not be effective until July 1, 2015, and therefore it was not "made" until that date. Since plaintiff filed its motion to set aside the transfer as fraudulent on January 23, 2019, within four years of that date, the motion was timely.

¶ 65     With respect to the assignments of Squires Cannon's patents and trademarks, the court found that the date the transfers were "made" for purposes of the Act was the date that they were recorded with the trademark office. The court found that the fact that the assignments were not notarized meant that the assignments lacked *prima facie* evidence that they were executed on July 1, 2011. The court further found that Meritus lacked standing to enforce the patents and trademarks until recordation, so "this Court is hard pressed to find how the transfer could be deemed to have occurred prior to recordation." Moreover, the court found that, until recordation, the assignments would be void as against a subsequent purchaser or mortgagee, meaning that they would not be considered "made" until that time.

¶ 66     Additionally, the court found that the assignments indicated that Squires Cannon reserved the right to receive royalties through July 2015 and that she maintained the right to negotiate

and grant licenses to the trademarks and patents. The court found that, "[a]s the very rights associated with ownership of the patent [and its] application and trademarks did not transfer until 2015, if at all, there is again no basis for concluding that the transfer actually occurred in 2011." Finally, the court found that it had also not been presented with any evidence that Meritus was even in existence in July 2011 so as to accept the assignments.

¶ 67    We cannot find that the trial court erred in finding that the transfers were made in 2015, not in 2011. First, as the trial court found, there was no evidence that the assignments were actually executed in 2011. Defendants claim that Squires Cannon testified that they were and also signed the assignments under penalty of perjury, which constituted evidence that they were signed in 2011. However, the testimony defendants point to occurred on June 18, 2019, during the evidentiary hearing on the motion to set aside the transfers, while the court's order finding the motion timely was entered earlier, on April 25, 2019. Moreover, we cannot find the mere fact that Squires Cannon signed the assignments under penalty of perjury is sufficient to establish that they were, in fact, signed on that date. This is especially true where the assignments were not recorded until 2015, and the "nature of the conveyance" on the recordings was listed as "*nunc pro tunc* assignment."

¶ 68    Additionally, as the trial court noted, the Act provides that, with respect to transfers that may be perfected under the law, a transfer is made "when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under this Act that is superior to the interest of the transferee." 740 ILCS 160/7(a)(2) (West 2018). However, with respect to patents and trademarks, an assignment is void as against any subsequent purchaser or mortgagee until it is recorded. See 35 U.S.C. § 261 (2018); 15 U.S.C. § 1060(a)(4) (2018). Thus, until the assignments were recorded, the transfers were not "made," since a subsequent

purchaser could obtain a superior interest. Accordingly, we cannot find that the trial court erred in finding the motion to bar timely.

¶ 69    We note that defendants suggest that the trial court was attacking the validity of the assignments, claiming that a lack of notarization does not affect the validity of an assignment and that recordation is not required for a valid assignment. However, this mischaracterizes what the trial court found. In fact, the trial court specifically addressed this very issue:

> "The only authority presented by Judgment Debtors in support of their argument that the July 1, 2011 'effective date' of the assignments governs, merely supports that recordation, lack of notarization, and reservation of royalties do not affect the 'validity' of an assignment. The 'validity' of the assignments is not presently at issue, however. Rather, the only issue presently before this Court is what constitutes the date of transfer under the [Act]."

Again, as with the issue of Merix's shares, the question is not whether the assignments constituted transfers, but when those transfers were "made." Here, we agree with the trial court that the assignments were made at the time they were recorded in 2015, making plaintiff's motion timely.

¶ 70                    B. Finding of Fraudulent Transfers

¶ 71    We turn, then, to the issue of whether the trial court erred in finding that the transfers were fraudulent. This is a factual question that we review under the manifest weight of the evidence standard. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 15. "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

29

¶ 72       As noted, under the Act, a transfer made by a debtor is fraudulent as to a creditor, if (1) the debtor made the transfer with actual intent to hinder or defeat a creditor (fraud in fact) or (2) the transfer was made for inadequate consideration and the debtor retained insufficient assets to pay its obligation to the debtor (fraud in law). 740 ILCS 160/5(a) (West 2018); *Regan*, 246 Ill. App. 3d at 803-04. In the case at bar, the trial court found that the transfers were fraudulent under both theories.

¶ 73       To prevail on a cause of action based on fraud in fact, "a party must prove that the transfers were made with the actual intent to hider, delay, or defraud the creditors." *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 193 (2010); *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 22. The Act provides 11 factors that may be considered in determining fraudulent intent:

"In determining actual intent ***, consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 740 ILCS 160/5(b) (West 2018).

¶ 74      In the case at bar, defendants contend that the trial court failed to adequately consider these factors in finding that the transfers were fraudulent. We do not find this argument persuasive. As an initial matter, it is clear that the Act does not require the trier of fact to consider all 11 factors. *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 23. Instead, "Illinois law is clear that when the factors of fraud 'are present in sufficient number, it may give rise to an inference or presumption of fraud.' " *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 23 (quoting *Steel Co. v. Morgan Marshall Industries, Inc.*, 278 Ill. App. 3d 241, 251 (1996)). In the case at bar, the trial court considered four of the factors, which it found weighed in favor of a presumption of fraud; the trial court also addressed the adequacy of consideration in its analysis of "fraud in law," which constitutes a fifth factor.

¶ 75      First, the court found that Squires Cannon's transfers were made to an insider because she was the sole and exclusive owner of Meritus.[10] Next, the court found that Squires Cannon

---

[10]If the debtor is an individual, the Act provides that an " '[i]nsider' " includes "a corporation of which the debtor is a director, officer, or person in control." 740 ILCS 160/2(g)(1)(D) (West 2018).

retained possession and control of the patents, trademarks, and shares after the transfers, which was evidenced by her ability to sell Releev's assets, and her continued control of Merix. The court further found that before the transfers were made in 2015, Squires Cannon had not only been sued but had been unsuccessful in her efforts to have the lawsuit dismissed. The trial court also found that the transfers were of substantially all of Squires Cannon's assets because she had purportedly transferred all other valuable assets the year prior to her mother-in-law. Finally, the court found that a reasonably equivalent value was not provided for the transfers, finding that the patents, trademarks, and shares were worth "substantially more" than the $10 consideration purportedly paid for them. We agree with the trial court that these factors were sufficient to establish a presumption of fraud. While defendants challenge these findings, their arguments essentially ask us to reweigh the evidence before the trial court. For instance, they claim that the trial court should have accepted Squires Cannon's testimony that the transfers were made for legitimate business and estate-planning purposes, despite the trial court's finding that her testimony was "self-serving and unconvincing." However, it is a "well-established legal princip[le] that the trier of fact, in this case an experienced trial judge, is free to accept or reject testimony and give whatever weight it deems appropriate to the evidence submitted." *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 26. Having reviewed the evidence before the trial court, we cannot find that its conclusion of fraud was against the manifest weight of the evidence.

¶ 76    We also cannot find that the factors that defendants contend the trial court "failed to consider" would change this result. As noted, the court was not required to discuss all 11 of the factors. *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 23. Additionally, several of the factors are similar (for instance, the fifth and ninth factors both concern the

debtor's financial status after the transfer) and others simply do not apply (for instance, the eleventh factor). While it may be the case that Squires Cannon did not abscond (the sixth factor) and did not conceal the transfers or the assets (the third and seventh factors), the record as a whole supports the trial court's finding that the transfers were fraudulent, and we cannot find that its conclusion was against the manifest weight of the evidence.[11]

¶ 77                      III. Joinder of Merix and Meritus

¶ 78      The final argument raised by defendants is that the trial court erred in finding that Merix and Meritus were not required to be joined as necessary parties to the fraudulent transfer proceedings. Defendants claim that, without their joinder, the court lacked jurisdiction to set aside the transfers as fraudulent. As an initial matter, the parties disagree as to the appropriate standard of review, with defendants arguing for a *de novo* standard of review and plaintiff arguing for an abuse of discretion standard. However, under either standard, our analysis is the same.

¶ 79      "A necessary party has been defined as one who has a legal or beneficial interest in the subject matter of the litigation and will be affected by the action of the court." (Internal quotation marks omitted.) *Holzer v. Motorola Lighting, Inc.*, 295 Ill. App. 3d 963, 970 (1998); *Crum & Forster Specialty Insurance Co. v. Extended Stay America, Inc.*, 375 Ill. App. 3d 654, 665 (2007). Courts have identified three reasons to consider a party "necessary" such that a lawsuit should not proceed in the party's absence: "(1) to protect an interest which the absentee has in the subject matter of the controversy which would be materially affected by a judgment entered in his absence; (2) to protect the interests of those who are before the court; or (3) to

---

[11]As we find that the trial court properly set aside the transfers as fraudulent based on fraud in fact, we have no need to consider the trial court's finding that the transfers were also fraudulent based on fraud in law.

enable the court to make a complete determination of the controversy." *Holzer*, 295 Ill. App. 3d at 970.

¶ 80    With respect to Merix, we cannot find that Merix was a necessary party to the fraudulent transfer proceedings. The only aspects of the proceedings that involved Merix were the facts that it was Merix shares that Squires Cannon was transferring to Meritus and that intellectual property rights were licensed to Merix. Defendants claim that "Merix clearly has an interest in who owns its shares and the intellectual property licensed to it." However, defendants cite no authority in support of this proposition, simply citing a case that indicates that a shareholder is entitled to participate in the selection of the management of the corporation through their elected directors. See *Gidwitz v. Lanzit Corrugated Box Co.*, 20 Ill. 2d 208, 215 (1960). Indeed, if we accept defendants' proposition, then a corporation would be a necessary party in any transaction in which the ownership of shares was transferred. Moreover, as to the intellectual property rights, the assignments executed by Squires Cannon did not affect the validity of the licenses, meaning that Merix's interest did not depend on the owner of the intellectual property. Accordingly, we cannot find that Merix was a necessary party to the fraudulent transfer proceedings.

¶ 81    With respect to Meritus, defendants contend that it was a necessary party because it was the recipient of the allegedly fraudulent transfers, meaning that it was affected by the court's judgment. The trial court found that, under the "doctrine of representation," Meritus' joinder was not necessary because Squires Cannon adequately represented its interests. Illinois law excuses the presence of a necessary party "where that party is represented by others in the suit that give the absent party's interest 'actual and efficient protection.' " *State Farm Fire & Casualty Co. v. John J. Rickhoff Sheet Metal Co.*, 394 Ill. App. 3d 548, 563 (2009) (quoting

34

*Holzer*, 295 Ill. App. 3d at 972). "The so-called 'doctrine of representation' requires that those who are brought into the suit 'have the same interest as have those not brought in, and are equally certain to bring forward the entire merits of the controversy as would the absent persons.' " *State Farm*, 394 Ill. App. 3d at 563-64 (quoting *Oglesby v. Springfield Marine Bank*, 385 Ill. 414, 423-24 (1944)).

¶ 82       In the case at bar, the trial court found that the interests of Squires Cannon and Meritus were identical in that both desired a ruling that the transfers not be deemed fraudulent. The court further found that Squires Cannon and Meritus were in privity, given Squires Cannon's sole ownership of Meritus, and noted that Squires Cannon had "vigorously defended" against the motion. The court found that, "[c]onsidering all that has been presented to the court, it is clear that Meritus and [Squires] Cannon are aligned. [Squires] Cannon is much more than an adequate representative of Meritus' interests. Thus, joinder is not necessary."

¶ 83       We agree with the trial court that Squires Cannon had the same interests as Meritus. While defendants contend that their interests were in conflict because, if set aside, the transferred property would revert to Squires Cannon, that wholly disregards the reality of the situation. If the transfers were upheld, Meritus, a company entirely owned by Squires Cannon, would own the property and Squires Cannon would have the ability to control the assets. By contrast, if the transfers were set aside as fraudulent, they would return to Squires Cannon only until they were turned over in the citation proceedings. Thus, both parties have the same interest in Meritus' retaining ownership of the property.

¶ 84       We further find unpersuasive defendants' contention that they were not permitted to introduce evidence showing that Squires Cannon was not the owner of Meritus. Defendants sought to admit certain records on July 24, 2019, after the evidentiary hearing on the motion

regarding the fraudulent transfers, claiming that they had just received the documents. On August 8, 2019, the trial court denied the admission of the records, finding them barred by the court's prior March 20, 2019, order barring defendants from introducing any evidence that had not been properly produced and further finding that they had not been properly authenticated as Meritus corporate records and therefore constituted hearsay. We cannot find that the trial court abused its discretion in denying the admission of this evidence, given the previous order barring such evidence and given their unauthenticated nature. See *Agnew v. Shaw*, 355 Ill. App. 3d 981, 988 (2005) ("The admissibility of evidence is a matter committed to the sound discretion of the trial court, and its decision will not be reversed on review absent a clear abuse of that discretion.").

¶ 85    Finally, we are unpersuaded by defendants' contention that the trial court was required to make a finding that it would be impossible to join Meritus as a necessary party. Even if it was required to do so, the evidence in the record shows that Meritus was a foreign corporation, incorporated in Dominica. The first time that plaintiff was provided any contact information whatsoever was the day before the evidentiary hearing on the motion to set aside the transfers, and this contact information consisted of a single line in Meritus' articles of association identifying Meritus' registered agent. While defendants claim that plaintiff could have sought a continuance to join Meritus at that point, there is nothing to suggest that joinder would have been successful, given the fact that plaintiffs had been seeking information about Meritus for over six months without success, especially given defendants' representations that they had also had difficulty obtaining information from Meritus. Consequently, the record supports the trial court's finding that joinder of Meritus was not necessary.

¶ 86                               CONCLUSION

¶ 87         For the reasons set forth above, we affirm the trial court's judgment. The court properly

entered judgment against Merix for violations of the citation, even in the absence of an

evidentiary hearing. However, as the trial court made a mathematical error in calculating the

judgment, we modify the judgment to reflect a total judgment amount of $1,393.834.29. The

court also properly found that the transfers to Meritus were fraudulent under the Act. Finally,

the court properly found that it was not necessary to join Merix and Meritus in the fraudulent

transfer proceedings.

¶ 88         Affirmed as modified.

**Nos. 1-20-0390, 1-20-0391 (cons.)**

| | |
|---|---|
| **Cite as:** | *McGinley Partners, LLC v. Royalty Properties, LLC*, 2021 IL App (1st) 200390 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2014-L-005231; the Hon. Daniel J. Kubasiak, Judge, presiding. |
| **Attorneys for Appellant:** | William J. Quinlan, Lisa H. Quinlan, David E. Hutchinson, Alex Walsdorf, and Jack McLeod, of Quinlan Law Firm, LLC, of Chicago, and Richard Kirk Cannon, of Law Offices of Cannon & Associates, of Barrington, for appellants. |
| **Attorneys for Appellee:** | Katherine Saldanha Olson and Joseph S. Messer, of Messer Strickler, Ltd., of Chicago, for appellee. |